UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **BRAD SIGMON**, <br><br> *Plaintiff,* <br><br> v. <br><br> **BRYAN P. STIRLING in his official capacity as Director of the South Carolina Department of Corrections; SOUTH CAROLINA DEPARTMENT OF CORRECTIONS; and ALAN WILSON in his official capacity as the South Carolina Attorney General**, <br><br> *Defendants.* | **Death Penalty Case** <br> ***Execution date*** <br> ***February 12, 2021*** <br><br> **COMPLAINT** |

## INTRODUCTION

Defendants intend to execute Plaintiff Brad Sigmon in fifteen days on February 12, 2021. Under state law, he may elect the method that Defendants will use to kill him—lethal injection or electrocution—by Friday, January 29. But Defendants have concealed what each of those methods of execution actually entails. They refuse to disclose what lethal injection protocol, if any, they will follow, or even what drug or drugs they will use. Nor have they provided the information needed to assess whether their electric chair will raise the "specter of excruciating pain" and the "certainty of cooked brains and blistered bodies" that has led other jurisdictions to declare it unconstitutional. *Dawson v. State*. 554 S.E.2d 137, 144 (2001). As a result, Mr. Sigmon cannot know what safeguards, if any, Defendants have taken to guard against his unconstitutionally torturous death.

Defendants' secrecy diminishes Mr. Sigmon's statutorily-provided right of election

to no more than a guessing game.  It prevents Mr. Sigmon and this Court from determining whether either or both of Defendants' methods violates his constitutional rights, and it prevents his counsel from safeguarding those rights, depriving him of their assistance in violation of statute and due process.  Defendants' secrecy casts doubt on the constitutionality of any execution imposed on Plaintiff.

At its heart, this lawsuit seeks to vindicate Plaintiff's rights to due process and to the assistance of counsel in making informed decisions related to his statutory right to select an execution method.  Unless Defendants provide their execution protocols and additional information Mr. Sigmon has pursued for months, he will become the first person in the United States in at least the last forty-five years to be executed without knowing how he will die.

## NATURE OF THE ACTION

This action is brought pursuant to 42 U.S.C. sections 1983 and 1988 and 28 U.S.C. sections 2201 and 2202, for violations and threatened violations of Brad Sigmon's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution; right to due process under the Fourteenth Amendment to the United States Constitution; and statutory and due process rights to the assistance of counsel pursuant to the Sixth Amendment to the United States Constitution and the Criminal Justice Act, 18 U.S.C. § 3006A, and its corresponding policies.  Plaintiff alleges the following against Defendants:

## PARTIES AND JURISDICTION

1.  Plaintiff Brad Sigmon is a citizen of the United States of America and an inmate currently imprisoned under a sentence of death.  He is under the custody and

control of the South Carolina Department of Corrections.

2. Defendant Bryan Stirling is the Director of the South Carolina Department of Corrections ("SCDC") and charged by South Carolina law with carrying out executions in South Carolina.  He is sued in his official capacity.

3. Defendant SCDC is an arm of the government of the State of South Carolina and is responsible for the custody and care of incarcerated individuals.

4. Defendant Alan Wilson is the Attorney General of South Carolina.  Wilson and his employees and agents, through the Office of the Attorney General, represent the State of South Carolina in any criminal and civil action in which the State of South Carolina has an interest.

5. This Complaint alleges violations of federal statutes and the United States Constitution.

6. This Court has subject matter over both the parties and the subject matter of this action.

## **FACTS**

7. South Carolina law provides that "[a] person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the person, lethal injection under the direction of the Director of the Department of Corrections."  S.C. Code Ann. § 24-3-530(A). The statute provides no specifics as to either method, leaving SCDC with unfettered discretion to perform lethal injections and electrocutions as it chooses. The prisoner must make "[t]he election for death by electrocution or lethal injection…in writing fourteen days before the execution date or it is waived." *Id.*  If

3

a prisoner fails to make an election by this date, the statute provides that the default method of execution is lethal injection. *Id.*

8. South Carolina has not carried out an execution by lethal injection since 2011. It has not carried out an execution by electrocution since 2008.

9. Brad Sigmon was sentenced to death in Greenville County for two counts of murder stemming from the same incident. He completed the ordinary course of his state and federal post-conviction proceedings on January 11, 2021, when the Supreme Court of the United States denied his petition for a writ of certiorari. *Sigmon v. Stirling*, No. 20-6166, 2021 WL 78320 (Mem.) (Jan. 11, 2021).

10. Several months before that date, on September 1, 2020, Sigmon's counsel Joshua Snow Kendrick and lawyers from Justice 360, which represents Sigmon and other death-sentenced inmates in South Carolina, sent a letter to Defendant SCDC requesting: (1) the SCDC lethal injection directive or protocol, including the "type(s) of lethal injection drug(s) to be used;" (2) the SCDC electrocution directive or protocol; (3) information related to the qualifications and training of individuals making up the execution team; and, (4) any modifications to the execution protocols related to the COVID-19 pandemic. Counsel made this request in keeping with Defendant SCDC's historical practice of providing its execution protocols to counsel for those prisoners' executions. Ex. 1.

11. On September 29, 2020, Salley W. Elliot, Defendant SCDC's Chief Legal and Compliance Officer, responded by letter denying each of Sigmon's requests and providing no information about how SCDC intends to carry out executions. Ex. 2.

12. Defendants have continued to oppose efforts by death-sentenced prisoners to

obtain information about Defendants' methods of execution. Undersigned counsel Justice 360 filed a complaint in this court alleging that Defendants' refusal to provide their execution protocols and related information violates Justice 360's right to professional speech under the First Amendment. Defendant SCDC opposes disclosure under this theory, although this litigation remains pending. *Justice 360 v. Stirling,* No: 3:20-03671-MGL (D.S.C.).

13. Defendants have also continued to request the scheduling of execution dates—first with Mr. Moore, and now with Mr. Sigmon—without disclosing this critical information and, apparently, without having possession of the drugs they intend to use in lethal injections.

14. On November 6, 2020, per Defendant Wilson's request, the Clerk of the Supreme Court of South Carolina issued an order scheduling Mr. Moore's execution on December 4, 2020. When serving notice of the execution warrant on Mr. Moore later that same day, Defendant SCDC's officials asked him then and there to exercise his right pursuant to Section 24-3-530(A) to elect his method of execution. When Mr. Moore declined, citing the lack of information provided as to either method, Defendant SCDC's officials stated that they would return on November 20, 2020—fourteen days before his scheduled execution and, per the statute, the last day on which he could make his election without waiver.

15. Mr. Moore made subsequent requests for the lethal injection and electrocution protocols through SCDC's staff request system. Defendant SCDC did not respond to Mr. Moore's requests prior to his deadline for electing between execution methods. After the deadline passed, SCDC officially denied Mr. Moore's requests.

16. When Mr. Moore filed petitions for mandamus, certiorari, and declaratory judgment in the original jurisdiction of the Supreme Court of South Carolina, however, Defendant SCDC appeared to accede, stating in a return filed on November 18, 2020, that it had "decided that it will allow members of Petitioner's legal defense team access to the protocols for both electrocution and lethal injection before Petitioner makes his election on, or before, November 20, 2020." Ex. 3. On that same day, however, Defendant SCDC's spokesperson issued a statement to the media indicating that they were "actively pursuing avenues to obtain the drugs necessary for lethal injection, but…do not have any."[1]

17. In their reply in the South Carolina Supreme Court, Mr. Moore's counsel noted that the lethal injection protocol offered for review could not possibly be final if Defendant SCDC did not actually possess the drugs it required. When Mr. Moore's counsel contacted Defendant SCDC to schedule that review, Defendant SCDC first imposed a list of "logistics for review" and demanded Mr. Moore's counsel sign a "confidentiality agreement" prior to review. The "confidentiality agreement" prohibited Mr. Moore's counsel from making notes or copying the protocols or sharing the information with experts or the courts for purposes of the election and potential Eighth Amendment litigation. The "confidentiality agreement" further subjected Mr. Moore's counsel to injunctive relief, money damages, and attorneys' fees and costs for any violation of the agreement. Because the question of the

---

[1] *See, e.g.* Michelle Liu, *South Carolina Schedules Execution but Doesn't Have Drugs*, ASSOCIATED PRESS, Nov. 18, 2020, https://apnews.com/article/coronavirus-pandemic-executions-south-carolina-spartanburg-fe4f4690d0d4ca8181e50f85b226a3ee (last visited January 25, 20201).

extent to which SCDC was required to provide information to Mr. Moore's counsel for consultation with experts and use in potential litigation was pending before the court, Mr. Moore's counsel refused to concede the information was confidential and declined to sign the "confidentiality agreement" and was not able to review the execution protocols. See Ex. 4.[2]

18. When Defendant SCDC's officials returned to Mr. Moore on November 20, 2020, he refused to sign the notices of election they provided him, writing instead that he could not "make a selection at this time to method because my attorney and I do not have information for the protocols. By not selecting does not mean I waive my right to select." Ex. 5.

19. Later that same day, Defendant SCDC's counsel sent a letter to Mr. Moore's attorneys asserting that "SCDC's current lethal injection protocol is a three-drug protocol, which begins with an injection of Pentobarbital, followed at an appropriate time interval by Pavulon (Pancuronium Bromide), and then followed at an appropriate time interval by Potassium Chloride." Ex. 6. Defendant SCDC then "reserve[d] the right *to amend its lethal injection protocol*," indicating that "if it is unable to secure sufficient quantities of each of the three drugs listed above, it is prepared to enact a one-drug protocol, which would consist of the use of Pentobarbital Sodium." *Id.* (emphasis added).

20. On November 30, 2020, the Supreme Court of South Carolina entered an order reporting that it had "been advised [that] the South Carolina Department of

---

[2] The Supreme Court of South Carolina ultimately declined to exercise its original jurisdiction without commenting on the merits of Mr. Moore's claims.

Corrections does not have, and will not be able to obtain, the drugs required for execution by lethal injection by December 4, 2020.   Accordingly, we stay the execution until the South Carolina Department of Corrections advises the Court it has the ability to perform the execution as required by the law."  Ex. 7.

21. Although Defendants have not yet advised the Supreme Court of South Carolina that they have obtained drugs to carry out executions, they are now repeating this sequence with Mr. Sigmon.  Within hours of the Supreme Court's denial of Mr. Sigmon's petition for a writ of certiorari on January 11, Defendant Wilson, through Senior Assistant Deputy Attorney General Melody Brown, notified the Supreme Court of South Carolina of the decision and urged it to issue an execution order. Ex. 8.

22. That same day, Mr. Sigmon filed a motion with that Court asking that it either decline to set a date for his execution or enter a temporary stay of execution— noting, inter alia, that Defendant SCDC had not yet advised the Court that it had obtained the drugs necessary to conduct an execution by lethal injection, as ordered by the Court in Mr. Moore's case.   Ex. 9

23. On January 14, 2021, Defendant Wilson filed an opposition to Mr. Sigmon's motion.   Ex. 10.   Defendant Wilson conceded that, "despite *on-going efforts*, [Defendant SCDC] still, as of this filing, has not been able to obtain drugs to carry out lethal injection."   Ex. 8 at 3, n. 2. (emphasis added).   Defendant Wilson nonetheless insisted that the Court schedule Mr. Sigmon's execution.

24. On Thursday, January 21, 2021, the Supreme Court of South Carolina entered an order directing Defendants Stirling and SCDC to execute Mr. Sigmon on the fourth

Friday from the date of the notice: February 12, 2021. Ex. 11.

25. Mr. Sigmon re-filed his motion for a temporary stay with the Supreme Court of South Carolina that same day.  The motion remains pending.

26. On Friday, January 22, Defendant SCDC's officials served notice of the execution warrant on Mr. Sigmon and, as with Mr. Moore, asked him to elect his method of execution.  Like Mr. Moore, Mr. Sigmon declined on the grounds that he has insufficient information concerning Defendants' execution protocols.

27. On Monday, January 25, Mr. Sigmon filed a request through SCDC's administrative system stating that he did not have enough information to choose between the two methods of execution and requesting SCDC provide him with both the lethal injection and electrocution protocols.  SCDC has not yet responded to Mr. Sigmon's request but based on their prior response to Mr. Moore's request for the same information, Mr. Sigmon and his counsel expect his request will be denied.

**Defendants Have Deprived Mr. Sigmon of the Information Necessary to Exercise and Safeguard His Rights**

28. As of this filing, Mr. Sigmon remains scheduled for execution on February 12, 2021.  Defendants have not obtained lethal injection drugs—or, at least, have notified no one to the contrary—but assert their efforts to do so are "ongoing." Consistent with their conduct in Mr. Moore's case, Defendants will insist, pursuant to South Carolina law, that Plaintiff Sigmon exercise his right to elect his method of execution on **Friday, January 29, 2021.**  Per Defendants' response to Mr. Sigmon's letter of September 29, 2020, and their subsequent representations, however, they will not—and, indeed, at this juncture, could not—provide him with

the information necessary for the meaningful exercise of that right.

29. On information and belief, no American jurisdiction has attempted to execute a person without providing him or his legal counsel access to basic information about how they will kill him.

30. Defendants ask Mr. Sigmon to choose between two options by which he will be executed.   One option is electrocution, yet they refuse to provide him with information about the current operability of their electric chair—which it has used since **1912**.  Mr. Sigmon does not know when or if it has been repaired, modified, inspected, or tested in the fifteen years since its last use. Defendants will not disclose their current procedures for electrocution, including: (1) the current or voltage they intend to administer to Mr. Sigmon, and how long they intend to administer it; (2) the scientific basis for the determination of the protocol; (3) the placement of the electrodes; (4) whether they intend to use natural or synthetic sponges, and the size and placement of these sponges; (5) what conductive material they intend to use (*i.e.*, ammonium chloride), and what the electrical conductivity of this material is; (6) what the electric schematic of the power supply is, and whether a test of the power supply will be conducted prior to an execution; (7) if and how they intend to adjust the current or voltage to account for differences in individual inmates' electrical resistance, based on their bone density and BMI, which impacts the effectiveness of execution by electrocution; and (8) what plans and procedures are in place in the case of a fire, a power failure, a blown fuse, or other unexpected event.

31. This information is critical in determining the risk of severe pain Mr. Sigmon may

face during his death.  The risks of electrocution are well-documented by the jurisdictions that have declared it unconstitutional.[3]  States that utilize it have experienced brutal botches. Pedro Medina's head burst into flames during his 1997 execution by electrocution—the second inmate to catch fire in the chair that decade—due to what a Florida court subsequently deemed "human error."[4]  Derick Lynn Peterson survived two applications of electricity during his 1991 execution in Virginia; it took three applications over seven-and-a-half minutes before he died. Wilbert Lee Evans bled profusely during his 1990 execution in Virginia; his blood sizzled as it dripped onto his shirt, drenching it, and he continued to moan until given a second shock of electricity.  Moreover, upon information and belief, South Carolina has executed at least one person by electrocution in a manner that caused needless and excruciating pain. See *Baxley v. Ozmint*, No. 3:07-cv-04067-CMC, Baxley Dep., ECF No. 47-8 at 140-41 (describing the electrocution of James

---

[3] *See State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008) ("electrocution has proven itself to be a dinosaur more befitting the laboratory of Baron Frankenstein than the death chamber of state prisons"); *Dawson*, 554 S.E.2d at 144 (death by electrocution raises "specter of excruciating pain" and the "certainty of cooked brains and blistered bodies"); *see also Bryan v. Moore*, 528 U.S. 1133 (2000) (dismissing as moot previously-granted cert petition raising whether Florida's use of the electric chair "unnecessarily exposes [condemned men] to physical suffering and degradation" and "wanton psychological and moral cruelty" violates the Eighth Amendment).

[4] This "human error" was identified as using too dry of a sponge, and on using the improper saline solution to conduct electricity. In Jessy Tafero's botched execution in 1990, in which he too caught fire, the report blamed the use of a synthetic sponge in place of a natural sponge. The engineers remained confident that the 74-year-old chair could not possibly have any flaws it its design. *See* Brent Kallestad, *Engineers say human error to blame in botched execution,* AP NEWS (April 11, 1997) (available at https://apnews.com/article/5b17fe6815673a23f1e88607c6e42e5a)

Tucker, during which Colie Rushton, currently employed by SCDC as the head of Security and Emergency Operations, was "[l]aughing and joking" after "they took the hood off and the inmates face was black, had his mouth like that, and like I said, his eyes and everything was just like he was in just gruesome pain").

32. On information and belief, SCDC has never developed an execution protocol for electrocution through any validated scientific or medical process that is designed to reduced pain and suffering. Over the years, the State continued to change its electrocution protocol, varying the strength and timing of the initial voltage and the subsequent charges, but that did not prevent botched electrocutions from happening.[5]   On information and belief, a significant percentage of executions by electrocution in South Carolina have resulted in unnecessary pain and suffering.

33. Alternatively, Defendants ask Mr. Sigmon to choose lethal injection, but have told only what drugs they *might* use, while reserving their "rights" to change their mind at any time.  Accordingly, Mr. Sigmon cannot know: which drugs Defendants would actually use, and in what dosage and combination; the origin of those drugs,

---

[5] In 1943, the state botched the execution of Jesse Jones, a large a powerful man, when they administered an initial shock of 2200 volts followed by two secondary shocks. *Jesse Jones is Executed for Murder*, THE GAFFNEY LEDGER (Apr. 6, 1943). The next year, when the State executed fifteen-year-old, ninety-pound George Stinney, Jr., they used a different protocol: 2400 volts, followed by a second burst of 1400 volts, and a third of 500 volts. The first shock knocked the mask off of George's face, and the electrocution was not immediately successful; while he was being transported to the funeral home for burial, George sighed loudly and a witness briefly detected a heartbeat. Deanna Pan & Jennifer Berry Hawes, *Young Lawyer Dusts of Old Evidence to Cast Doubt on George Stinney's Conviction*, POST & COURIER (Mar. 26, 2018), https://www.postandcourier.com/news/special_reports/young-lawyer-dusts-off-old-evidence-to-cast-doubt-on-george-stinneys-conviction/article_d31c3a90-2928-11e8-b103-33404ec5d9c5.html; CHARLES KELLY, NEXT STOP ETERNITY at 54 (2016).

including where, when, and how they were manufactured or compounded; the quality control measures and results of any testing administered to ensure the identity, purity, potency, acidity or causticity ("pH"), and purity of the lethal injection drugs, and to detect contamination; how the drugs were stored and handled; and the expiration dates of both the drugs themselves.

34. Nor will Mr. Sigmon know the procedures Defendants would actually follow, or the training and qualifications of personnel administering it. The risks posed by inexperienced and unqualified execution teams are well documented. Without sufficient training, the team members have required multiple attempts to establish an intravenous line, causing unnecessary pain to the prisoner. This risk is illustrated by Ohio's 2009 attempt to execute Romell Broom, whose inexperienced execution team and prison doctor stabbed him with needles for more than two-and-a-half hours, leaving him in agony, before the governor halted his execution.[6]

35. Inexperienced and unqualified execution teams have begun executions without establishing a patent IV line in the prisoner's vein, causing the prisoner extreme pain and suffering and significantly delaying when the drugs take effect. These risks are illustrated by Florida's 2006 execution of Angel Diaz, when a misplaced line allowed the caustic lethal injection drugs to leak into the soft tissue of his arms, causing chemical burns so severe that the skin on his arms sloughed away but failing to render him unconscious.[7] Similarly, the personnel for Oklahoma's 2014

---

[6] *After Surviving Botched Execution, Romell Broom Dies of Covid-19*, EJI ((Jan. 4, 2021) (available at: https://eji.org/news/after-surviving-botched-execution-romell-broom-dies-of-covid-19/)

[7] Ben Crair, *Photos from a Botched Lethal Injection*, THE NEW REPUBLIC

execution of Clayton Lockett pierced a vein in his groin, causing him to writhe and gasp for thirty minutes before he died of a heart attack.[8]  But even if an IV is properly placed, the rate at which the executioners administer the drug or drugs can affect both the pain the prisoner experiences and the efficacy of the execution.

36. A sordid episode in South Carolina's own history with executions suggests a combination of these risks.  In 1997, Michael Eugene Elkins was probed with needles for more than an hour before the execution team located a supposedly suitable vein in the back of his neck, and only after Elkins himself asked the executioners, "Should I lean my head down a little bit?" The execution began at 12:01 a.m., but Elkins was not pronounced dead until nearly an hour later, at 12:58 a.m.

37. Such risks remain a significant concern at SCDC.  South Carolina has used a three-drug lethal injection protocol featuring Pentobarbital only once, in May of 2011, and has carried out no executions of any kind since.  Upon information and belief, SCDC did not provide its employees with training even then. See *Baxley*, No. 3:07-cv-04067-CMC, Amended Complaint, ECF No. 6 at ¶ 25 (Dec. 21, 2007).  On at least one occasion, the employees administering the drugs developed their plan as to how they would inject the drugs on the day of the execution as they were

---

(May 29, 2014), available at: http: www.newrepublic.com/article/117898/lethalinjection-photos-angel-diazs-botched-execution-florida (Last visited: January 25, 2021). Counsel cautions the Court that the photos of the damage done to Mr. Diaz by the improperly-injected drugs are quite graphic.

[8] Jeffrey E. Stern, The Cruel and Unusual Execution of Clayton Lockett (June 2015) (Available at: https://www.theatlantic.com/magazine/archive/2015/06/execution-clayton-lockett/392069/)

picking up the drugs. *Baxley*, No. 3:07-cv-04067-CMC, Bracy Dep., ECF No. 47-4 at 60-62, 69, 74-75 & ECF No. 47-5 at 107:13-22 (June 8, 2009). On another occasion, while the execution was taking place, drugs began to leak on the floor. *Baxley*, No. 3:07-cv-04067-CMC, Baxley Dep., ECF No. 47-8 at 153. The executioners hoped it would not be a problem and prepared to administer more drugs. *Id.* (describing Colie Ruston "act[ing] like it was all a game and laughing and joking and that kind of thing" while lethal injection "drugs along with [the condemned man's] blood and everything went on the floor" and the condemned man "flat-line[ed] without us going to the second set of drugs"). These guess-and-check procedures increase the likelihood of a condemned person suffering a painful and torturous death.

38. On information and belief, SCDC may force its employees to take part in Sigmon's execution, complicating the situation further by introducing the uncertainty of a disgruntled or emotionally unwell executioner. *E.g.*, *Baxley*, No. 3:07-cv-04067-CMC, Amended Complaint, ECF No. 6 at ¶¶ 8-9, 15, 25 (Dec. 21, 2007).

## FOR A FIRST CAUSE OF ACTION

**(Violation of Due Process Rights to Notice and an Opportunity to Be Heard)**

39. The 5th and 14th Amendments to the United States Constitution guarantee American citizens the right to due process.

40. Citizens are entitled to due process protections if the interest they assert falls within the implicit meaning of liberty or if it flows from an expectation created by state law or policies. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

41. The right to life is the most fundamental of the liberty rights protected by the

constitution, and when the government seeks to deprive a citizen of life, the process to which they are entitled is correspondingly robust.  *See Louisiana ex rel Francis v. Resweber*, 329 U.S. 459, 467 (1947) (Frankfurter, J., concurring).  For a condemned person, adequate process encompasses not only the criminal trial and corresponding appellate rights, but also the procedures necessary to ensure that his sentence is carried out in a manner consistent with notions of fundamental fairness.  *E.g.*, *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) (describing why due process requires states to provide a condemned person who has made a substantial showing of insanity an opportunity to be heard).

42. When a condemned person is facing execution, he is entitled to enough process to ensure that his punishment is not carried out "in a manner that violates standards of decency."  *Francis*, 329 U.S. at 379 (Frankfurter, J., concurring).  At a minimum, that process must encompass the foundational elements of due process: notice and an opportunity to be heard "*at a meaningful time and in a meaningful manner.*" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (emphasis added).

43. By not informing Mr. Sigmon how it intends to kill him, SCDC has deprived him of adequate notice of the method of his execution, which has deprived him of a meaningful opportunity to test the fairness of that method.

44. Specifically, SCDC's refusal to provide even the most basic information about his execution has interfered with his right to "adequate, effective, and meaningful" access to the courts.  *Bounds v. Smith*, 430 U.S. 817, 822-23 (1977); *see also Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) ("[R]ight of access to the courts . . . is founded in the Due Process Clause.").  Inherent in the concept of due process

is the notion that the aggrieved must have "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds*, 430 U.S. at 825)); *see also Murray v. Giarratano*, 492 U.S. 1, 11, n. 6 (1989) (plurality opinion) (access to courts a due process right). SCDC's silence here goes beyond the "incidental (and perfectly constitutional) consequences of confinement and incarceration." *Cf. Giarratano v. Johnson*, 521 F.3d 298, 306 (4th Cir. 2008). Instead, SCDC has unconstitutionally hindered Mr. Sigmon's "efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. *See also Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004) (a prisoner's access to the courts must be free from "undue interference" (quoting *Elder v. Holloway*, 510 U.S. 510, 514 (1994)).

## <u>FOR A SECOND CAUSE OF ACTION</u>

### **(Violation of Procedural Due Process Rights)**

45. This Claim is grounded in Mr. Sigmon's state-created interest in the right to choose between the two methods of execution authorized by South Carolina law.

46. Apart from interests that flow directly from the words in the Due Process Clause, a state also triggers procedural due process protections when it creates a legitimate claim of entitlement through law or "the existence of rules and understandings, promulgated and fostered by state officials." *See Perry v. Sindermann*, 408 U.S. 593, 602-03 (1972). *See, also e.g., Vitek v. Jones*, 445 U.S. 480, 489-90 (1980) (statute providing that prisoners could be transferred to mental institutions only if found to suffer from mental diseases or defects created a protectable liberty interest); *Greenholtz v. Inmates, Neb. Penal & Corr. Complex*,

442 U.S. 1 (1979) (protected liberty interest in parole); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (statute granting good time credit to prisoners for time served absent serious misconduct created protectable liberty interest); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) (same as  to probation revocation); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (same as to parole revocation).

47. By enacting a statute that gives condemned inmates the right to elect between the two authorized methods of execution, South Carolina has created a protected liberty interest.  *See Wolff*, 418 U.S. at 557 ("[T]he State having created [a] right [to a process] . . . the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.").  And because the statute includes the option to waive the decision, the statute encompasses the right to make an informed decision.  *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

48. Once a state has enacted a statute or promulgated an agency rule that gives its citizens a legitimate expectation that they will receive the benefit of the state law, the state may not then deprive its citizens of the those benefits without providing due process. *See Perry*, 408 U.S. at 602-03.  What process a citizen is due depends on the nature of the interest at stake.

49. To assess the adequacy of a given state procedure, courts must balance three

factors: (1) the weight of the individual interest at stake; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and, (3) the government's interest in maintaining the existing procedures. *Mathews v. Eldridge*, 424 U.S. 319, 323, 335 (1976).

50. Mr. Sigmon's interest here is weighty.  South Carolina did not have to give condemned individuals the right to make an informed decision about how they will die, but it did. As a result, Mr. Sigmon's right to make that selection is a now corollary to "the duty of the government to respect the dignity of all persons."  *Hall v. Florida*, 572 U.S. 701, 708 (2014) (quoting *Roper v. Simmons*, 543 U.S. 551, 572 (2005)); *see also Bush v. Gore*, 531 U.S. 98, 104 (2000) (states may not arbitrarily depart from established process); *Myers v. Ylst*, 897 F.2d 417, 421 (9th Cir. 1990) ("[W]e agree that once a state has established a rule it must be applied evenhandedly.").

51. Without the additional process Mr. Sigmon has requested—access to basic information about how he will be executed and an opportunity to pursue that information in the courts, if appropriate—there is a documented, unacceptably high risk that the State will carry out an unconstitutional execution.  This is the process available in all other jurisdictions that carry out executions, and it is the process guaranteed under the constitution.  *E.g. Bucklew v. Precythe*, 139 S. Ct. 1112, 1121-22 (2019) (examining, with a stay of execution in place, a state's proposed method of execution in great detail, only after the condemned man had an opportunity for "extensive discovery").

52. SCDC's historical practice reinforces the notion that a condemned person in South Carolina has a right to the information Mr. Sigmon now seeks and that the additional burden on the state would be minimal. On information and belief, before every other execution in the past thirty years, SCDC has provided inmates and their attorneys, upon their request, access to detailed information about how the execution will be carried out.

53. Because SCDC has arbitrarily decided not to give Mr. Sigmon any information about how it plans to execute him, Mr. Sigmon cannot make an informed choice between death by electrocution or lethal injection and cannot make a valid waiver of that decision. Tomorrow, he must choose between two methods of execution, lacking more than the barest description of either. If he declines to exercise it, Defendants will execute him by lethal injection.

54. More disturbingly, Defendants give every indication of moving forward with Mr. Sigmon's execution despite representing that they have no drugs for use in lethal injection. That, combined with Defendants' claim of right to amend the protocol at any time, suggests that they intend to ambush Plaintiff by executing him with drugs obtained at the last minute, from whatever supplier might hastily provide them, with no opportunity for Plaintiff to review the lethal injection protocol for potential constitutional violations. If Defendants present Plaintiff with the protocol (or present him with changing protocols, as they have indicated they may do) after the election date on Friday, January 29th, Plaintiff has no right to "re-elect" under the statute. This shocking behavior is both arbitrary and fundamentally unfair to Plaintiff.

55. The additional process Mr. Sigmon has requested would impose a *de minimus*

burden on Defendants. Defendants have no valid interest in withholding this information.

## FOR A THIRD CAUSE OF ACTION

### (Violation of Prohibition on Cruel and Unusual Punishment)

56. The 8th Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment and is applicable to the States through the 14th Amendment.

57. A bedrock principle of our rule of law is that "where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." *See Marbury v. Madison*, 5 U.S. 137, 163 (1803).

58. As a corollary to this principle, the Supreme Court has recognized that, as a matter of fundamental fairness, States must provide condemned people with sufficient process to protect themselves against executions that would violate the Eighth Amendment. *E.g.*, *Ford v. Wainwright*, 477 U.S. 399, 417-18 (1986) (plurality opinion) (once a condemned person has made a facially adequate showing of incompetence, states must afford adequate process to protect against an unconstitutional execution); *Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992) (at jury *voir dire* in a capital case, a condemned person is entitled to additional information and procedures to assess the impartiality of jurors).

59. Mr. Sigmon has the right to challenge his method of execution if that execution will create needless suffering or expose him to an "objectively intolerable risk of serious harm." *Baze v. Rees*, 553 U.S. 35, 50 (2008).

60. The Defendants' secrecy prevents Plaintiff from determining whether the method

the State plans to use for his execution is constitutional.  Mr. Sigmon must be able to meaningfully review the specific methods by which he will be executed and present any infirmities in those methods to a competent court.

61. To vindicate his rights under the Eighth Amendment, Mr. Sigmon must have adequate time prior to his execution date to review the protocol and additional information he has requested in consultation with experts in order to prepare for the possibility of a constitutional violation.  *See Hall*, 132 S. Ct. at 2001 ("Persons facing [death] must have a fair opportunity to show that the Constitution prohibits their execution.").

62. The pleading standards for these challenges are complex and fact intensive, and require the inmate to show (1) that the challenged method of executions poses a sure or very likely risk of serious illness and needless suffering and (2) that there exists an alternative method of execution that is feasible and readily implemented and that will significantly reduce the risk of serious pain.  *Baze*, 553 U.S. at 50, 52. As § 24-3-530(A) places no restrictions on how Defendants may administer lethal injections and electrocutions, Mr. Sigmon can have no way of knowing how they propose to execute him in anything but the broadest terms unless they provide their protocols.  Defendants' secrecy, and their claim of right to amend their execution protocols at any time without notice, therefore makes it impossible for Mr. Sigmon to satisfy these pleading requirements beyond allegations on information and belief.  *But see Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ("The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from 'pleading facts alleged upon information and belief'

where the facts are peculiarly within the possession and control of the defendant." (internal citations omitted)); *Innova Hosp. San Antonio, Limited Partnership v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) ("[W]hen discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint."); *Green v. Beth*, 663 Fed. App'x 471, 473-74 (7th Cir. 2016) (same, for allegation of deliberate indifference under the Eighth and Fourteenth Amendments).  Upon such information and belief, however, Mr. Sigmon alleges that if Defendants' protocols, once disclosed, reveal an unconstitutional risk, he will be able to identify and plead reasonably available alternatives, including safeguards to Defendants' protocols or a different method.

63. Their interference with Plaintiff's efforts to assert his constitutionally protected right not to die by torturous means is a violation of the Eighth Amendment because it exposes him to an objectively intolerable risk of serious harm.

64. Executing Plaintiff pursuant to a lethal injection or electrocution protocol without established safeguards would violate his rights under the Eighth and Fourteenth Amendments to be free from Cruel and Unusual Punishment.

65. The Defendants are deliberately indifferent to Plaintiff's rights in violation of the Eighth and Fourteenth Amendments.

66. Defendants' refusals to disclose have violated and will continue to violate Plaintiff's constitutional rights.

## FOR A FOURTH CAUSE OF ACTION

### (Violation of Right to Counsel)

67. The 5th, 6th, and 14th Amendments to the United States Constitution guarantee the right to counsel.

68. Plaintiff has the right to counsel at all critical stages of his case, including the election of an execution method and his actual execution.

69. In addition to a constitutional right to counsel, Plaintiff has a statutory right to counsel pursuant to federal law.

70. The Criminal Justice Act (CJA) and CJA policies require a district court to appoint counsel for an indigent person who is seeking to set aside or vacate a death sentence in proceedings under 28 U.S.C. § 2254. *See* 18 U.S.C. § 3006A(a)(1).

71. Plaintiff's counsel were appointed pursuant to the CJA and 18 U.S.C. § 3599(e). See DE 173, 251, 260. *Sigmon v. Stirling, et. al.*, 8:13-cv-01399-RBH.

72. Plaintiff has a statutory and constitutional right to representation up until his death sentence is carried out. The assistance of counsel means the effective assistance of counsel.

73. By denying Plaintiff and his counsel access to information that is necessary for Plaintiff to make the election decision, Defendants have denied Plaintiff the right to assistance of counsel.

## FOR A FIFTH CAUSE OF ACTION

### (Request for Declaratory Judgment)

74. As set out in this Complaint, the Defendants' actions have violated Plaintiff's clearly established constitutional rights under the 5th, 6th, 8th, and 14th Amendments to the United States Constitution.

75. 28 U.S.C. § 2201 grants this Court broad authority to declare the rights and

relations of parties before it.

76. Plaintiff asks this Court to declare the Defendants have violated his constitutional rights as described in this Complaint and fashion any appropriate relief to vindicate those rights.

## FOR A SIXTH CAUSE OF ACTION

### (Request for Preliminary Injunction)

77. Plaintiff requests this Court enjoin the Defendants from executing him with a secret protocol and method they refuse to release to Plaintiff or his attorneys. Plaintiff will file a motion in support of this request.

## PRAYER FOR RELIEF

Plaintiff requests the Court grant the following relief:

a. A preliminary injunction prohibiting the Defendants from carrying out or attempting to carry out the execution of Plaintiff Sigmon without providing him the information he has requested with sufficient notice of at least one month ahead of his execution date.

b. Declaratory relief as requested in this Complaint.

c. Any other relief the Court deems just and proper.

Respectfully Submitted,

**_s/ Joshua Snow Kendrick_**
Joshua Snow Kendrick (Fed ID 9037)
KENDRICK & LEONARD, P.C.
506 Pettigru Street (29601)
P.O. Box 6938
Greenville, SC 29606
Tel: (864) 760-4000
Josh@KendrickLeonard.com

Megan Barnes (Fed ID 13283)
Justice 360
900 Elmwood Ave, Suite 200
Columbia, SC 29201
(803) 765-1044
megan@justice360sc.org

Gerald "Bo" King
FEDERAL PUBLIC DEFENDER
Capital Habeas Unit
129 West Trade Street, Suite 300
Charlotte, NC 29202
Gerald_king@fd.org
*Admitted pro hac vice*

ATTORNEYS FOR PLAINTIFF

January 28, 2021