**EXHIBIT 9**

THE STATE OF SOUTH CAROLINA
IN THE SUPREME COURT

Case No. 2002-024388

BRAD KEITH SIGMON
*Petitioner*,

v.

STATE OF SOUTH CAROLINA,
*Respondent*.

MOTION FOR TEMPORARY STAY OF EXECUTION

Brad Keith Sigmon, an indigent prisoner under sentence of death, respectfully requests that this Court either decline to set a date for his execution or enter a temporary stay of execution.[1]

Mr. Sigmon seeks this relief for three reasons: First, the South Carolina Department of Corrections (SCDC) has not yet advised this Court that it has the means to conduct an execution by lethal injection, as required by this Court's order in *Moore v. State*, No. 2001-021895 (Nov. 30, 2020). The mere setting of an execution date, irrespective of whether SCDC has the means or intent to attempt it, imposes significant consequences for the Department of Corrections (administration, staff, and inmates), counsel for the State and the condemned individual, and the courts. Second, attempting an execution during a global pandemic creates unnecessary and unjustified health risks to SCDC staff, Mr. Sigmon's legal team, and the witnesses designated by S.C. Code Ann. § 24-3-550 (2012). Third, moving forward with an execution date during this

---

[1] It its letter to the Court filed Jan. 11, 2021, the Attorney General makes no representation to its ability to carry out an execution, nor does it formally request the Court set a date.

1

pandemic impedes Mr. Sigmon's access to counsel, whose assistance he requires to select a method of execution, to prepare and present his application for executive clemency, and to determine whether grounds exist to seek habeas relief per this Court's original jurisdiction.

In support of this motion, Mr. Sigmon apprises this Court of the following facts and legal principles.

### I. Relevant Procedural History

In 2002, Mr. Sigmon was convicted of murder and sentenced to death in Greenville County, South Carolina. On December 19, 2005, this Court upheld Mr. Sigmon's convictions and sentence on direct appeal. *State v. Sigmon,* 366 S.C. 552 (2005). Mr. Sigmon applied for post-conviction relief ("PCR") on October 13, 2006; the lower court denied relief, and this Court denied his petition for a writ of certiorari. *Sigmon v. State*, 403 S.C. 120, 742 S.E.2d 394 (2013).

Mr. Sigmon subsequently sought federal habeas relief under 28 U.S.C. § 2254, which the District Court of South Carolina denied on March 21, 2018. *Sigmon v. Stirling*, 2018 U.S. Dist. LEXIS 168699. The Fourth Circuit granted a Certificate of Appealability but subsequently denied relief and rehearing. *Sigmon v. Stirling*, 956 F.3d 183 (4th Cir. 2020). Mr. Sigmon filed a petition for a writ of certiorari in the United States Supreme Court, which was denied on January 8, 2021. The Attorney General then requested this Court set an execution date in Mr. Sigmon's case.

### II. Reasons to Delay Setting an Execution Date or Issue a Stay of Execution.

Because SCDC does not have the means to lawfully carry out this execution and should not attempt to do so during a global pandemic, "exceptional circumstances" warrant issuance of a

stay instead of an execution date. *See In Re Stays of Execution in Capital Cases*, 321 S.C. 544, 548, 471 S.E.2d 140 (1996).[2]

> A. *This Court Has Previously Determined That A Stay of Execution is Necessary and Warranted Based on SCDC's Determination that it Cannot Obtain Lethal Injection Drugs, and the Setting of a Date Would Have Real Consequences on All Parties.*

On November 30, 2020, this Court stayed Richard Moore's execution after SCDC reported that it did not have, and would not be able to obtain, the drugs necessary to carry out an execution by lethal injection. Order, *State v. Moore*, Appellate Case No. 2001-021895 (Nov. 30, 2020). This Court's stay in *Moore* remains in effect until SCDC informs this Court that it has the "ability to perform the execution as required by law." *Id.* In the intervening five weeks, nothing has changed; SCDC has not informed this Court or counsel for Moore that it can lawfully carry out an execution. There is no reason for the attorneys, the courts, and SCDC to spend weeks preparing for an execution when it is clear no lawful execution can proceed.[3]

---

[2] Because South Carolina Code Section § 17-25-370 contemplates that either a stay or an execution date will be in place in all cases, this Court should enter a temporary stay of execution as it did in the *Moore* case.

[3] Because SCDC has represented that it does not know which drugs it would be able to legally obtain, much less all the necessary details of a lethal injection protocol, Mr. Sigmon would be unable to make an informed decision about his method of execution, now or two weeks prior to the execution date, as required by S.C. Code Ann. § 24-3-530. If an inmate fails to select a method of execution, the statute defaults to lethal injection. If SCDC still cannot obtain the lethal injection drugs, this Court would be required to enter a stay just as in Richard Moore's case. If SCDC does find a pharmacy willing to provide the chemicals for a lethal injection execution, defense counsel would require more than the fourteen days before Mr. Sigmon's execution to evaluate the new protocol and determine if the protocol is constitutional or requires litigation. This would also require a stay of execution. To avoid placing Mr. Sigmon and the rest of death row on execution status, instigating other end-stage protocols on death row, and beginning end-stage litigation when the ultimate outcome will be a stay of execution, this Court should enter a stay until SCDC affirms they have the lethal injection drugs and provides defense counsel adequate time to review the protocol with the client and their experts.

The issuance of an execution warrant has instant and significant consequences for this Court, SCDC and state attorneys, defense attorneys, SCDC security officers, and inmates. Once SCDC receives an execution warrant, it immediately places the condemned inmate on "execution status," which requires his assignment to Level III (normally reserved for those deemed a serious security risk) and confinement in a different wing of the prison, in an isolation cell with constant video surveillance and lights that cannot be turned off. He is not permitted to speak with other inmates. Security officers must make a physical visit to his cell every 15 minutes. In addition, SCDC places the entire death row unit on lock down, eliminating all recreation and prohibiting inmate interaction until a stay is entered or the inmate is executed; during that time, the death row psychologist must conduct a mental health evaluation of each inmate. Additionally, SCDC must initiate its other execution procedures, which include scheduling the inmate's final visits with family and spiritual advisors, planning for disposal of the inmate's property, and, with the inmate's family, determining the disposition of the inmate's corpse and any funeral arrangements. These superadded processes place substantial stress and anxiety on both SCDC staff and inmates—an unnecessary toll when the execution could not be carried out.

Furthermore, so long as a warrant is in place, undersigned counsel cannot assume that the execution will not go forward. We must treat any execution date as "real" and initiate any litigation necessary to obtain information about SCDC's intended method and means of execution and other ancillary matters. The Attorney General's office and counsel for SCDC will have to respond to those actions, and the courts will have to adjudicate them—an unnecessary expenditure of resources by counsel and the courts.

In sum, no date should not set, or a stay should be entered until SCDC informs this Court that it has the ability to carry it out.

B. *Conducting an Execution in the Midst of a Global Pandemic Would be an Unnecessary and Unreasonable Risk to the Health of all Involved*

As this Court has recognized, the ongoing COVID-19 pandemic continues to impact all aspects of life in South Carolina and around the world. *See, e.g.*, *Adams v. McMaster*, 2020 WL 5939936, No. 2020-001069, at *3 (S.C. Oct. 7, 2020). Since January 2020, 1,189,420 individuals have died from COVID-19 worldwide; nationally, COVID-19 is responsible for at least 364,218 deaths.[4] As of January 7, 2021, South Carolina had 338,112 documented cases of COVID-19 and 5,661 deaths (with the death rate increasing by 83 percent over the last two weeks).[5] South Carolina has been in a State of Emergency since March 13, 2020[6], with the upcoming months projected to be the worst of the pandemic, as holiday travel is "light[ing] up" the state with new infections[7] just as a more contagious strain of the virus has entered the country, overburdening our

---

[4] *COVID-19 Dashboard,* Center for Systems Science at John Hopkins University (updated Jan. 7, 5:23 PM), https://coronavirus.jhu.edu/map.html. It is worth noting that when our office filed a similar motion in Mr. Moore's case on November 2, 2020, 228,667 people had died in the United States; over a third of the deaths related to the COVID-19 pandemic in our nation have occurred in the last two months.

[5] *South Carolina Covid Map and Case Count*, N.Y. Times (Updated Jan. 7, 2021, 2:08 PM), https://www.nytimes.com/interactive/2020/us/south-carolina-coronavirus-cases.html. When we filed the motion in Mr. Moore's case on November 2, 2020, there were 174,591 cases and 3,889 deaths in the state; in two months, the infection rate has nearly doubled. Over the Thanksgiving and Christmas holidays, an additional 1,772 people died.

[6] S.C. Exec. Order No. 2020-09 (Mar. 13, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-13 FILED Executive Order No. 2020-08 - State of Emergency Due to Coronavirus (COVID-19).pdf. The Governor renewed the State of Emergency most recently on December 23, 2020. S.C. Exec. Order No. 2020-67 (Dec. 23, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-12-23%20FILED%20Executive%20Order%20No.%202020-77%20-%20State%20of%20Emergency.pdf

[7] *SC 'to see a big surge coming up' in coronavirus cases after holidays, MUSC expert warns*, Post and Courier (last updated Jan. 07, 2021) https://www.postandcourier.com/health/covid19/sc-to-see-a-big-surge-coming-up-in-coronavirus-cases-after-holidays-musc-expert/article_8b6f85e4-5030-11eb-bdba-0bff912c91b6.html

5

already strained hospitals.[8] In recognition of the present dangers, this Court has just entered an order once again suspending jury trials[9] and all in-person hearings, beginning Monday, January 11, 2021.[10]

Like many other correctional institutions around the country[11], SCDC has been severely impacted by COVID-19, with at least 15 percent of its entire inmate population having been infected[12] and dying at a rate 97 percent higher than the rest of the state[13]—conditions so dire that SCDC Director Bryan Stirling stated in December that his guards were "risking their lives" every day.[14] This is despite mitigation measures imposed in March 2020 that restricted entrance to essential staff, increased screening of staff and inmates, limited transfers and in-person attendance

---

[8] *Id*.

[9] S.C. Exec. Order No. 2020-12-03-01 (Dec. 3, 2020), https://www.sccourts.org/courtOrders/displayOrder.cfm?orderNo=2020-12-03-01

[10] S.C. Exec. Order No. 2021-01-06-01 (Jan. 6, 2021), https://www.sccourts.org/courtOrders/displayOrder.cfm?orderNo=2021-01-06-01

[11] *COVID-19 Cases and Deaths in Federal and State Prisons Significantly Higher Than in U.S. Population*, Johns Hopkins Bloomberg School of Public Health (July 8, 2020), https://www.jhsph.edu/news/news-releases/2020/covid-19-cases-and-deaths-in-federal-and-state-prisons-significantly-higher-than-in-u.s.-population.html.

[12] *See COVID-19 Information*, S.C. Dep't Corrections (updated Oct. 29, 2020, 9:22 AM), http://doc.sc.gov/covid.html; *Average Daily Inmate Population*, S.C. Dep't Corrections, (updated Oct. 1, 2020), http://www.doc.sc.gov/research/SystemOverview/Avg_pop_FY_1970-2020.pdf.

[13] *A State-by-State Look at Coronavirus in Prisons*, Marshall Project (updated Dec. 18, 2020, 12:35 PM), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons. As we were drafting this motion, another man incarcerated within SCDC passed away in the hospital after being infected with COVID-19. *COVID-19 Update*, S.C. Dep't. Corrections (Jan. 5, 2021 6:00 PM), http://www.doc.sc.gov/COVID19_death_010521.pdf

[14] *Nearly 4,000 SC Corrections workers are getting bonuses during the COVID-19 pandemic*, The State, (last updated Dec. 18, 2020) https://www.thestate.com/news/politics-government/article247917035.html

at hearings, and barred family visitation.[15]  Broad River Correctional Institution ("Broad River"), which houses all death row inmates in South Carolina, has seen 415 inmates infected (with 29 current cases) and nine deaths,[16] alongside the second-highest number of confirmed staff infections, with 82 confirmed cases and one death.[17]  While there is no official count available for death row, Mr. Sigmon and other clients of undersigned counsel report that six of the thirty-six men on death row have been tested for COVID-19, with four testing positive. The entire unit has been placed on quarantine with all legal visits (in-person and virtual) suspended multiple times because of COVID-19.

All but two states have stayed or declined to set execution dates during the pandemic.[18] Just last week Tennessee granted an "indefinite" stay to an inmate due to a "surge in COVID-19 cases in the state."[19]  The federal government stands alone in continuing to conduct executions this year and has exposed FCI Terre Haute staff and inmates to the virus. The federal death row unit

---

[15] *See COVID-19 Update*, S.C. Dep't. Corrections (Dec. 31, 2020 12:00 PM), pdf http://www.doc.sc.gov/COVID19_visitation_123120.pdf. As of now, these restrictions remain in place through the end of January and will likely be extended.

[16] *COVID-19 Information*, S.C. Dep't Corrections (updated Jan. 7, 2021 9:35 AM), http://doc.sc.gov/covid.html.  This institution accounts for approximately 15 percent of the confirmed cases across the twenty-two state institutions.

[17] *Id.* Staff infection numbers are based on self-report, not department testing. *Id.*

[18] Missouri executed one person in May but no one since. *Missouri executes first US inmate put to death during coronavirus pandemic*, CNN, (updated May 20, 2020) https://www.cnn.com/2020/05/20/us/missouri-executes-inmate-walter-barton/index.html.  Texas executed one person in June, but then began delaying execution dates due to the risks posed by COVID-19.  *7th Texas Execution Delayed as Attorneys Cite Pandemic*, US News (Aug. 17, 2020), https://www.usnews.com/news/best-states/texas/articles/2020-08-17/7th-texas-execution-delayed-as-attorneys-cite-pandemic.

[19] *Tennessee death row inmate Oscar Smith granted indefinite stay of execution due to COVID-19*, News Channel 5 (updated Jan. 6, 2021), https://www.newschannel5.com/news/tennessee-death-row-inmate-oscar-smith-granted-indefinite-stay-of-execution-due-to-covid-19

experienced an outbreak of COVID-19 cases after two executions were conducted in July,[20] and after the November execution of Orlando Hall, no fewer than fourteen of the fifty federal death row inmates had tested positive.[21]

The sparse information about SCDC execution facilities[22] and protocols[23] indicate that an execution in South Carolina poses even greater risks of viral spread. While SCDC declines to disclose how many individuals will be involved in the execution, some number will have to escort Mr. Sigmon to the chamber, restrain him to the chair or gurney, and attach the equipment provided for the chosen execution method. The presiding physician will have to examine Mr. Sigmon after the method has been carried out to pronounce his death. But SCDC's current procedures make it impossible to know whether execution team members carry the virus, which risks asymptomatic transmission.[24] CDC-recommended social distancing is impossible in the death chamber, which

---

[20] Henderson Hill, *New Data Connect the Federal Executions and a COVID-19 Outbreak in Indiana*, ACLU (Sept. 22, 2020), https://www.aclu.org/news/capital-punishment/new-data-connect-the-federal-executions-and-a-covid-19-outbreak-in-indiana/

[21] Virus Hits Federal Death Row, Prompting Calls for Delays in Executions, New York Times (updated Dec. 21, 2020), https://www.nytimes.com/2020/12/21/us/politics/coronavirus-death-row-executions.html

[22] The Capital Punishment Facility at Broad River was built in 1988 and has not been updated since its original construction. *Death Row / Capital Punishment*, S.C. Dep't Corrections, http://www.doc.sc.gov/news/deathrow.html.

[23] In preparation for Richard Moore's possible execution, undersigned counsel asked SCDC what health and safety procedures would be put in place to ensure that the safety of all participants including members of the execution team and authorized witnesses. SCDC initially declined to provide any information about COVID-19 protocols, but later stated that the only plans they had to modify the execution process in regards to COVID-19 safety protocols would be to adjust "seating and arrangements" for those viewing the execution. *See* Colie Rushton Aff. ¶12 (Nov. 18, 2020) (filed on as Ex. 1 to SCDC's Return to Richard Moore's Petition for Common Law Remedial Writs of Certiorari and Mandamus and to Petition for Original Jurisdiction and Declaratory Judgment on November 18, 2020).

[24] Widespread testing of staff is not being conducted. Currently, staff are being screened with a questionnaire and a temperature check when they come to the facility, and are only being sent home if they answer yes to screening questions or have a temperature of over 100.4 degrees *COVID-19 FAQs*, S.C. Dep't Corrections (updated Apr. 24, 2020), http://doc.sc.gov/COVID-

measures 15'8" by 20', with a 10'4" ceiling, brick walls, and vinyl flooring according to the most recent information provided by SCDC.

Ten witnesses are statutorily authorized to be present at the execution, including: the victim's family; a solicitor and law enforcement officer from the county where the offense occurred; media representatives; and two witnesses on behalf of the inmate, selected from his immediate family, any spiritual advisors, or counsel. S.C. Code § 24-3-550 (2012). An execution would endanger them all.[25] Upon arriving for the execution, the witnesses must wait together at the front gate before being transported back to view the execution. SCDC provides no information as to how they will be safely screened. Witnesses are typically transported to the Capital Punishment Facility grouped together in three vans, in which social distancing is impossible. Once in the facility, the witnesses sit in a single row of chairs positioned before a window into the execution chamber, where they must sit close together for everyone to have an unobstructed view of the execution. While the dimensions of the witness room are not available, given the dimensions of the execution chamber, its window cannot be longer than 20 feet. Despite SCDC's promise to modify seating, it is difficult to imagine that ten people could socially distance within that space while witnessing. Nor is there any requirement that these witnesses quarantine for the CDC-recommended 14 days if they have traveled out-of-state, or have a negative COVID-19 test prior

---

19_FAQs_4-24.pdf. No other testing is being conducted to ensure that asymptomatic positive staff members are not coming into Broad River or any other SCDC institutions, and all COVID-19 testing of staff is being self-reported, not SCDC facilitated. *See COVID-19 Information*, S.C. Dep't Corrections (updated Oct. 17, 2020, 11:18 AM), http://doc.sc.gov/covid.html.

[25] Mr. Sigmon is statutorily given the choice of which witnesses he wants to be there on his behalf. *See* S.C. Code § 24-3-550(5) (2012). Mr. Sigmon's right to select these witnesses and their right to witness the execution would both be impacted were the execution to be carried out currently due to travel restrictions and quarantine requirements.

9

to entering, or wear personal protective equipment. Accordingly, witnessing virtually ensures prolonged opportunities for COVID-19 exposure.

Conducting an execution under the current conditions at Broad River and without health and safety procedures in place to protect all who have a right to be present would be irresponsible and dangerous to those present and the communities in which they reside.

Given the risks associated with this deadly and highly-communicable virus and the current procedures (and lack thereof) at Broad River, an execution cannot be conducted without endangering all of those involved and the communities where they live. So long as South Carolina's state of emergency is in effect, no execution should occur.[26]

> D. *A Delay in Setting an Execution Date is Necessary to Give Meaningful Effect to Mr. Sigmon's Right to Counsel to Assist in Selection of a Constitutional Method of Execution, Seeking Executive Clemency, and Assessing Whether there are Grounds to file an Original Habeas Petition*

Per counsel's ethical duty to their client, they must treat any execution date as "real," and prepare end-stage proceedings such as executive clemency, an original habeas petition, method-of-execution litigation, and any other collateral challenges necessary to protect their client's rights. Many require investigation, including witness interviews. Each requires frequent, extensive, and privileged communications with her client. The risks these end-stage proceedings pose to counsel are patent, as demonstrated by counsel for federal death row prisoner Lisa Montgomery, who contracted COVID-19 while traveling to see her, necessitating a stay of her execution until they recovered.[27]

---

[26] Counsel filed a similar motion based on the risks posed by COVID-19 in Richard Moore's case. While it is not clear if this Court ruled upon that motion, the pandemic has only worsened in the two months since it was filed.

[27] *First federal execution of a woman in decades halted after lawyers diagnosed with Covid*, NBC News (updated Nov. 19, 2020), https://www.nbcnews.com/news/us-news/first-federal-execution-woman-decades-halted-after-lawyers-diagnosed-covid-n1248284

i. Selection of Execution Method

The current COVID-19 restrictions on counsel's access to Mr. Sigmon have also impaired their ability to assist him with the difficult decisions concerning the selection of execution method—which requires the painstaking evaluation of lethal injection versus electrocution.[28] Counsel also plays an important role in supporting the inmate as they face their last days, discussing wrenching matters such as his choice of witnesses and desired arrangements after death. These challenges will be heightened for Mr. Sigmon, as SCDC could reveal plans for his execution with very little notice, leaving counsel little time to prepare him legally or emotionally. These conversations are hard enough during an in-person visit. Conducting them virtually, through fifteen-minute telephone or video calls, during which clients are frequently interrupted or distracted, and confidentiality cannot be guaranteed, is simply inadequate.

ii. Clemency

Any death sentenced individual has the constitutional right to pursue executive clemency from the Governor under Article IV, Section 14. S.C. Const. art. 4, § 14. *See also* S.C. Code §§ 24-21-910 to 24-21-1000. Clemency plays a vital and deeply-rooted role in our system of capital punishment. As the Supreme Court has recognized, "[i]t is an unalterable fact that our judicial system, like the human beings who administer it, is fallible," *Herrera v. Collins*, 506 U.S. 390, 415 (1993), and clemency is the "fail safe" to prevent miscarriages of justice after all judicial process has been fully exhausted, *id.* at 411 (internal quotations omitted). The Court has also recognized clemency's importance as a means of grace, as it allows for "consider[ing] a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations." *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 281 (1998).

---

[28] *See* S.C. Code § 24-3-530; *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019).

To that end, the Court recognizes the condemned's residual life interest in seeking that grace, *id.*, and the importance of his having the assistance of counsel throughout the clemency process, *Harbison v. Bell*, 556 U.S. 180, 194 (2009). That recognition is echoed in the ABA Guidelines, which detail clemency counsel's professional and ethical obligations.[29] Undersigned counsel Megan Barnes and Josh Kendrick have been appointed by the federal courts to represent Mr. Sigmon in his executive clemency proceedings. To represent Mr. Sigmon in keeping with the ABA standards and the dictates of the United States Supreme Court, however, counsel would need meaningful access to Mr. Sigmon, the ability to conduct necessary investigation, and adequate expert access to Mr. Sigmon. *See, e.g., Harbison*, 556 U.S. at 184–86. Because of the COVID-19 pandemic, however, none of these has been fully available for nearly fourteen months.

Indeed, SCDC restrictions on visitation and guidance from the South Carolina Department of Health and Environmental Control has made these basic tasks impossible. On March 16, 2020, SCDC suspended family visitation and placed restrictions on attorney visitation in accordance with Governor McMaster's Executive Order 2020-08; it has continuously reaffirmed the suspension. Mr. Sigmon's counsel has only been able to visit him in person *once* in the last six months. Their interaction with him has otherwise been limited to fifteen-minute phone calls and a handful of video visits. Moreover, during a month-long quarantine on death row between September 25 and October 27, 2020, legal visits were stopped entirely. No attorney was able to speak with Mr. Sigmon (or any other death row inmate) in person or via video during that time.

---

[29] ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.15.2, p. 1088 (2003). The ABA Guidelines have been recognized by this Court as codifying time-honored norms of capital representation. *See Ard v. Catoe*, 372 S.C. 318, 642 S.E.2d 590 (citing ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and reversing capital trial due to defense counsel's fact investigation falling below that required by the guidelines); *see also Council v. State*, 380 S.C. 159, 670 S.E.2d 356 (2008)(citing ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and reversing death sentence due to inadequate mitigation investigation).

Given the scope of work required, counsel would need to visit a client facing an imminent execution several times per week, with the frequency of visits only increasing as the execution date neared. Moreover, counsel's restricted access to Mr. Sigmon has left them unable to assess the need for additional expert assistance in support of clemency—to say nothing of the hindrance those restrictions would place upon an expert assessment, given the impossibility of conducting a complete evaluation via video conferencing and the danger of visiting death row given Broad River's infection rates.

Moreover, counsel cannot conduct the necessary investigation with Mr. Sigmon's family in South Carolina without disregarding Governor McMaster's executive orders and endangering herself and them. In-person interviews are a central component of investigation. But it is neither safe nor wise for counsel to conduct *any* in-person interviews currently. This is particularly true for Mr. Sigmon's parents—both of whom are critical witnesses but also seriously ill, with his mother dependent on the care of his sister and brother while his father lives in an elder care facility. Any attempt to interview them would be enormously risky for them and those who care for them. Indeed, for the last several months, even Mr. Sigmon's family has been barred from seeing his father, given the elevated risks of transmission within his facility.

There is simply no adequate substitute for the field-based observations in-person interviews provide. And while some phone and video interviews can be conducted, their limitations are exacerbated by the mental health impacts of the pandemic, which have complicated rapport-building—a precondition to discussing the potentially difficult experiences and memories that form a clemency presentation.[30]  Accordingly, what limited investigation that could be done in

---

[30] Courts have found counsel ineffective for only conducting phone interviews. *See, e.g., Doe v. Ayers*, 782 F.3d 425, 438-39 (9th Cir. 2015); *Brown v. Thaler*, 684 F.3d 482, 488 (5th Cir. 2012); *Ferrell v. Hall*, 640 F.3d 1199, 1219 n. 14 & 1229 (11th Cir. 2011); *Harries v. Bell*, 417 F.3d 631,

13

current conditions would "violat[e] minimum standards of performance," as the collected information would be unreliable and incomplete.

The inability to conduct an inadequate investigation deprives Mr. Sigmon of his meaningful representation and, in turn, prevents Governor McMaster from considering the "wide range of factors" necessary to carry out his solemn duty, and determine whether Mr. Sigmon. That is reason alone for this Court to declining to set an execution date.

### iii. Original Habeas

Many of the tasks and duties required of counsel in clemency are also essential to her assessment of whether Mr. Sigmon should file an original habeas petition. Pursuing an original writ of habeas corpus is statutorily and constitutionally guaranteed for inmates sentenced to death. *See* S.C. Const. art. 1, § 18; S.C. Code § 17-17-10 (2012). It exists as a failsafe to ensure that the inmate's sentence does not "constitute[] a denial of fundamental fairness shocking to the universal sense of justice." *Butler v. State*, 302 S.C. 406, 468, 397 S.E.2d 87, 88 (1990) (internal citations omitted).

For that failsafe to function, however, counsel must have access to their client and the ability to undertake necessary investigation – neither of which are possible to safely do in the midst of the current pandemic, for the reasons detailed above (and incorporated here). Declining to set an execution date is necessary to ensure that Mr. Sigmon's counsel is able to assess the necessity of an original habeas petition, and to ensure that he does not forfeit statutory and constitutional rights.

---

638 (6th Cir. 2005). Record collection has also been impacted by COVID-19 related "closures, partial closures, furloughs, and alternative working situations" making the location and release of records difficult, if not impossible. Many essential records for investigation purposes are not be included in the digitized collections that might be available for release.

## CONCLUSION

For the reasons stated above, this Court should temporarily suspend setting an execution date or enter a temporary stay of execution.

Respectfully submitted,

s/ Megan Barnes
MEGAN BARNES
Justice 360
900 Elmwood Avenue, Suite 200
Columbia, SC 29201
(803) 765-1044
megan@justice360sc.org

JOSHUA SNOW KENDRICK
Kendrick & Leonard, P.C.
Post Office Box 6938
Greenville, SC 29606
(864) 760-4000
Josh@kendrickleonard.com

January 11, 2021.