UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **BRAD SIGMON**, <br><br> *Plaintiff,* <br><br> v. <br><br> **BRYAN P. STIRLING in his official capacity as Director of the South Carolina Department of Corrections; SOUTH CAROLINA DEPARTMENT OF CORRECTIONS; and ALAN WILSON in his official capacity as the South Carolina Attorney General**, <br><br> *Defendants.* | **Death Penalty Case** <br> ***Execution date*** <br> ***February 12, 2021*** <br><br> **Case No. 3:21-cv-00278-RBH** <br><br> **MOTION FOR PRELIMINARY INJUNCTION (STAY OF EXECUTION)** |

Defendants intend to execute Plaintiff Brad Sigmon in fifteen days. Tomorrow, January 29, they will demand that he exercise his right under state law to elect how he dies: by lethal injection or electrocution. But Defendants have concealed what each of those methods of execution actually entail. They refuse to tell him the origin or nature of the drugs with which they propose to inject him, or to disclose what protocol, if any, they will follow. Plaintiff Sigmon does not know what safeguards, if any, Defendants have taken to avoid an unconstitutionally torturous death by lethal injection.

Defendants also refuse to provide the information needed to assess whether their electric chair will raise the "specter of excruciating pain" and the "certainty of cooked brains and blistered bodies" that has led other jurisdictions to declare it unconstitutional. *Dawson v. State*. 554 S.E.2d 137, 144 (2001).

Defendants' secrecy diminishes Mr. Sigmon's statutorily provided right of election to no more than a guessing game. It also prevents him, or this Court, from determining whether either or both of these methods violate his constitutional rights. It prevents his counsel from safeguarding those rights, depriving him of their assistance in violation of statute and due process. That secrecy casts doubt on the constitutionality of any execution imposed on Plaintiff.

Plaintiff has filed a lawsuit asserting the violations of his constitutional rights that flow from the actions of the Defendants. This Court should grant a preliminary injunction, which will stay Plaintiff's execution.

## FACTS

Prisoners sentenced to death in South Carolina have a statutory right to elect execution by either electrocution or lethal injection. S.C. Code Ann. § 24-3-530(A). Prisoners must make the election in writing 14 days prior to the execution date or the right is waived. If no choice is made, the execution method defaults to lethal injection.

South Carolina has not executed anyone by lethal injection since 2011 and has not executed anyone by electrocution since 2008. Neither the inmate nor his attorney in 2011 requested the execution method protocols. However, prior to that execution the South Carolina Department of Corrections ("SCDC") provided information related to execution method, either lethal injection or electrocution, to prisoners and their attorneys sufficient to evaluate the constitutionality of the choice and methods.

Plaintiff was sentenced to death in Greenville County for two murders stemming from the same incident. He completed the ordinary course of his state and federal post-conviction proceedings on January 11, 2021, when the Supreme Court of the United

States denied his petition for a writ of certiorari.

Several months before that date, on September 1, 2020, Sigmon's counsel Joshua Snow Kendrick and lawyers from Justice 360, which represents Sigmon and other death-sentenced inmates in South Carolina, sent a letter to Defendant SCDC requesting: (1) the SCDC lethal injection directive or protocol, including the "type(s) of lethal injection drug(s) to be used;" (2) the SCDC electrocution directive or protocol; (3) information related to the qualifications and training of individuals making up the execution team; and, (4) any modifications to the execution protocols related to the COVID-19 pandemic. DE 1-1.[1]

On September 29, 2020 Defendant SCDC, through attorney Salley Elliott, the Department's Chief Legal and Compliance Officer, responded and denied the request for information. In addition to admitting it did not have the drugs necessary for an execution by lethal injection, the letter claimed any sources of the drugs would remain secret under S.C. Code § 24-3-580. The response stated: "[w]e do not agree that you are entitled to the information you have requested." DE 1-2.

The attorneys who sent the letter represent three inmates sentenced to death and facing imminent execution. The inmate scheduled for the earliest execution at the time the letter was sent was Richard Moore. Moore is represented by attorneys from Justice 360, who also represent Plaintiff Sigmon. After Elliott's letter refusing to provide information on execution methods, Justice 360 made extensive efforts to obtain the information which Defendants continue to block.

---

[1] All cites to "DE" refer to the docket entry in this case.

The Defendants' behavior in the Moore matter is instructive, as they have given no indication they will behave any differently in Sigmon's case. They have continued to request the scheduling of execution dates without disclosing this critical information or, more surprisingly, without having possession of the (unspecified) drugs they intend to use in lethal injections—first with Moore, and now with Sigmon.

On November 6, 2020, Defendant Wilson requested the Clerk of the Supreme Court of South Carolina issue an order scheduling Mr. Moore's execution on December 4, 2020. When serving notice of the execution warrant on Mr. Moore later that same day, Defendant SCDC's officials asked him then and there to exercise his right pursuant to Section 24-3-530(A) to elect his method of execution. When Mr. Moore declined, citing the lack of information provided as to either method, Defendant SCDC's officials stated that they would return on November 20, 2020—fourteen days before his scheduled execution and, per the statute, the last day on which he could make his election without waiver.

Defendant SCDC did not respond to Mr. Moore's subsequent requests for its lethal injection and electrocution protocols through its staff request system. When Mr. Moore filed petitions for mandamus, certiorari, and declaratory judgment in the Supreme Court of South Carolina Defendant SCDC appeared to accede. Defendant stated in a return filed on November 18, 2020, that it had "decided that it will allow members of Petitioner's legal defense team access to the protocols for both electrocution and lethal injection before Petitioner makes his election on, or before, November 20, 2020." DE 1-3.

On that same day, however, Defendant SCDC's spokesperson issued a statement to the media indicating that they were "actively pursuing avenues to obtain the drugs

necessary for lethal injection, but…do not have any."[2]  Defendant's offer to allow the attorneys to view the protocol was meaningless, as it did not know at the time whether it would use the protocol.

In their reply in the South Carolina Supreme Court, Mr. Moore's counsel noted that the lethal injection protocol offered for review could not possibly be final if Defendant SCDC did not actually possess the drugs it required.  Mr. Moore's counsel contacted Defendant SCDC to schedule that review. Defendant SCDC first imposed a list of "logistics for review" including prohibitions on copies or photographs of the protocols and the designation of any notes as "confidential." Defendants also demanded that Mr. Moore's counsel sign a "confidentiality agreement" that subjected them to injunctive relief, money damages, and attorneys' fees and costs. DE 1-4.

The confidentiality agreement would have required Moore's attorneys to abandon their duties to Moore under the United States Constitution and the South Carolina Rules of Professional Conduct, so they refused to sign it. Defendant SCDC's actions forced Moore's counsel to cancel the protocol review, further impeding their ability to advise Moore on his statutory right to elect his method of execution. DE 1-4.

The day after the review was cancelled, and after the statutory deadline for Moore's election of an execution method, a private lawyer representing Defendant SCDC wrote Moore's attorney, purporting to provide information on the lethal injection protocols:

---

[2] *See, e.g.* Michelle Liu, *South Carolina Schedules Execution but Doesn't Have Drugs*, ASSOCIATED PRESS, Nov. 18, 2020,  https://apnews.com/article/coronavirus-pandemic-executions-south-carolina-spartanburg-fe4f4690d0d4ca8181e50f85b226a3ee(last visited January 25, 2021).

SCDC has authorized me to provide you the following information. SCDC's current lethal injection protocol is a three-drug protocol, which begins with an injection of Pentobarbital, followed at an appropriate time interval by Pavulon (Pancuronium Bromide), and then followed at an appropriate time interval by Potassium Chloride. A similar three-drug protocol utilized by the State of Kentucky, was found to be constitutional by the Supreme Court of the United States. *See Baze v Rees*, 553 U.S. 35, 128 S.Ct. 1520 (2008).

SCDC reserves the right to amend its lethal injection protocol, and if it is unable to secure sufficient quantities of each of the three drugs listed above, it is prepared to enact a one-drug protocol, which would consist of the use of Pentobarbital Sodium. As you know, a recent challenge to the constitutionality of the Pentobarbital Sodium single-drug protocol as utilized by the Federal Bureau of Prisons, was unsuccessful before the Supreme Court of the United States. *See Barr v. Lee*, 140 S.Ct. 2590 (2020).

The letter offers no real information. It reserves the right to amend the protocol and lists two protocols the State of South Carolina had no present ability to utilize. DE 1-6.

The letter did not disclose the specifics of the execution methods requested by Moore's attorneys. It simply described an aspirational process SCDC hoped to use. Five days later, the Defendants finally informed the Supreme Court of South Carolina they did not have the drugs needed to execute Moore and the Court stayed his execution. DE 1-7. The court issued a stay of Moore's execution until SCDC informs the court "it has the ability to perform the execution as required by law." DE 1-7.

The same sequence of events is developing in Plaintiff Sigmon's case. On January 11, just hours after the United States Supreme Court denied Sigmon's petition for a writ of certiorari, Defendant Wilson informed the Supreme Court of South Carolina of the decision and urged it to issue an execution date. DE 1-8. On the same day, Sigmon filed a motion asking the Court to decline to set an execution date or enter a stay, noting that Defendant SCDC still had not informed the Court it had the drugs it intended to use in its executions. DE 1-9.

In other words, Sigmon requested a stay in part for the very same reason the

Defendants themselves requested a stay in Moore's case—their inability to carry out the execution. The Defendants opposed the stay, despite admitting they still did not have the drugs necessary for a lethal injection execution. DE 1-10.

On Thursday, January 21, 2021, the Supreme Court of South Carolina issued an order directing Defendants Stirling and SCDC to execute Sigmon on the fourth Friday from the date of the notice, February 12. DE 1-11. Sigmon re-filed a motion for a temporary stay in the Supreme Court the same day.

On the next day, January 22, 2021, Defendant SCDC served the execution warrant on Sigmon and asked him to elect a method of execution. As in in the Moore matter, Sigmon had no information on how the Defendants plan to execute him. He declined to elect a method based on the lack of information regarding SCDC's execution protocols.

On Monday, January 25, Mr. Sigmon filed a request through SCDC's administrative system stating that he did not have enough information to choose between the two methods of execution and requesting SCDC provide him with both the lethal injection and electrocution protocols. As of this filing, SCDC has not responded to Sigmon's request.

As of this filing, Mr. Sigmon remains scheduled for execution on February 12, 2021. Defendants have not obtained lethal injection drugs—or, at least, have notified no one to the contrary—but their efforts to do so are "ongoing." Defendants will insist that Plaintiff Sigmon exercise his right to elect his method of execution on Friday, January 29, 2021. However, per Defendants' response to Mr. Sigmon's letter of September 29, 2020, and their subsequent representations, they will not—and, indeed, at this juncture, could not—provide him with the information necessary for the meaningful exercise of that right.

The ongoing violations of Plaintiff's constitutional rights forced him to file a §1983 action in this Court. Because of Plaintiff's imminent execution and the Defendants' ongoing violation of Plaintiff's constitutional rights, this Court must grant a preliminary injunction and stay Sigmon's execution until this case is resolved.

## ARGUMENT

Filing a §1983 action will not automatically result in a stay of execution. *Hill v. McDonough*, 547 U.S. 573, 583-84 (2006). An inmate who requests time to challenge the way a state intends to execute him must satisfy the requirements for a stay, including a showing of significant possibility of success on the merits. *Id.* at 584.

This Court must grant a preliminary injunction when the Plaintiff establishes: (1) likelihood of success on the merits; (2) irreparable harm without the preliminary relief; (3) the balance of equities tips in his favor; and, (4) an injunction is in the public interest. *Winter v. NRDC, Inc.,* 55 U.S. 7, 20 (2008). Because Sigmon easily meets all four prongs, this Court should stay his execution and allow this action to proceed.[3]

## 1.    SIGMON IS LIKELY TO SUCCEED ON THE MERITS.

At its heart, this action involves Sigmon's rights related to how the State will execute him. South Carolina allows inmates to choose the method by which they will be executed, lethal injection or electrocution. Up to 2009, when the last non-voluntary execution was carried out,[4] it appears the Defendants always provided the execution protocols to inmates and their attorneys. See attached previous South Carolina execution

---

[3] In addition to this motion for an injunction, Sigmon has also filed a motion for expedited discovery under the local rules.

[4] Jeffrey Motts was executed in 2011 after he gave up any challenges to his execution. It does not appear he or his attorney requested the execution protocols.

protocols.

There are compelling reasons why this information is critical for a person choosing how they will be executed. Primarily, there is a real danger of an unconstitutional execution when the method is cloaked in secrecy as it is here. The Defendants are seeking more than confidentiality, they are refusing to provide any information related to the execution. As the letter to Sigmon's counsel states, the Defendants do not believe a condemned inmate is entitled to the information. Without the information, a death sentenced inmate cannot make an informed decision between the two methods or identify an alternative method as the Supreme Court requires. *Baze v. Rees,* 553 U.S. 35, 52 (2008).

More disturbingly, the later letter to Richard Moore's counsel provides limited information on the lethal injection protocol, but specifically states Defendant SCDC reserves the right to amend the execution protocol, even after the statutory deadline for selecting an execution method. Under SCDC's interpretation of the law, the election right is meaningless. If Defendants can change their methods and protocols at any time,  the premises and consequences of the inmate's election could be upended well after the statute requires him to make it.

A.      The Defendants have violated Sigmon's procedural due process rights.

The Due Process Clause of the 14th Amendment prevents a state from depriving any person of life, liberty, or property without the due process of law. It protects the individual's right to both procedural and substantive due process. *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997).

There is no question Plaintiff Sigmon has a protected interest in this matter. The

United States Supreme Court and the South Carolina Supreme Court have recognized life is a fundamental right and all persons have an inherent right to life. *Ford v. Wainwright,* 477 U.S. 399, 409 (1986); *Grimball v. Beattie*, 174 S.C. 422, 443 (1934).

In addition to that inherent right, there is a right to due process protection when the interest is created by state law or policies. *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005). It is clear South Carolina has created a statutory right for a death-sentenced inmate to elect the method of execution. South Carolina law grants an inmate the right to choose between either lethal injection or electrocution. S.C. Code Ann. § 24-3-530.

Sigmon's choice has been stripped of meaning by the state action in this case. By refusing to reveal the execution protocols for the available methods of execution, the Defendants have given Sigmon two equally disturbing options. Because he knows nothing about either method of execution, he cannot know whether the State will execute him in the manner required by the Constitution. More importantly, there will be no remedy in this case if the State continues to ignore its constitutional obligations in executing Sigmon.

The request for information on execution protocols is critically important. The Supreme Court has recognized that society continues to steadily move towards more humane ways of carrying out capital punishment. *Baze v. Rees,* 553 U.S. 35, 62 (2008). Due process cannot be precisely defined; but there is no doubt it requires fundamental fairness. *Lassiter v. Dep't of Social Services,* 425 U.S. 18, 24-25 (1981). That fundamental fairness requires the process due a citizen match his interest in the liberty at stake.

In order to properly protect Sigmon's interests, the Court must consider three

factors: (1) the weight of the individual interest at stake; (2) the risk of an erroneous deprivation of the interest through the procedures used and the value of any other procedural safeguards; and (3) the government's interest in maintaining the existing procedures. *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

1.    Sigmon was a significant interest in deciding how he will die.

The individual interest at stake is the weightiest interest that will come before the Court. The right to life is the most fundamental of all rights. Even when a citizen has been sentenced to death, the state cannot execute that person in a manner that poses a substantial risk of serious harm or an objectively intolerable risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 846 n.9 (1994).

South Carolina's statutory right to elect the manner of execution is grounded in the interest the condemned has in making an informed decision on the method of execution. That interest flows directly from the idea that Sigmon cannot be executed in a torturous, unconstitutional way. The Defendants' actions seek an execution with no oversight. They refuse to provide any of the information required to make an informed decision. History demonstrates there is a realistic chance of a botched execution, especially in light of the State's attempt to carry out the execution in secrecy.

a.    *Botched executions are a realistic possibility*

Sigmon's requests for information related to his execution are based in the realistic possibility an execution will not comply with the Eighth Amendment. It has certainly happened in the past.

Defendants ask Mr. Sigmon to choose between two options by which he will be executed. One option is electrocution, yet they refuse to provide him with information

about the current operability of their electric chair—which it has used since 1912. Mr. Sigmon does not know when or if it has been repaired, modified, inspected, or tested in the fifteen years since its last use.

Defendants will not disclose their current procedures for electrocution, including: (1) the current or voltage they intend to administer to Mr. Sigmon, and how long they intend to administer it; (2) the scientific basis for the determination of the protocol; (3) the placement of the electrodes; (4) whether they intend to use natural or synthetic sponges, and the size and placement of these sponges; (5) what conductive material they intend to use (i.e., ammonium chloride), and what the electrical conductivity of this material is; (6) what the electric schematic of the power supply is, and whether a test of the power supply will be conducted prior to an execution; (7) if and how they intend to adjust the current or voltage to account for differences in individual inmates' electrical resistance, based on their bone density and BMI, which impacts the effectiveness of execution by electrocution; and (8) what plans and procedures are in place in the case of a fire, a power failure, a blown fuse, or other unexpected event.

This information is critical in determining the risk of severe pain Mr. Sigmon may face during his death. The risks of electrocution are well-documented by the jurisdictions that have declared it unconstitutional.[5] States that utilize it have experienced brutal

---

[5] *See State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008) ("electrocution has proven itself to be a dinosaur more befitting the laboratory of Baron Frankenstein than the death chamber of state prisons"); *Dawson*, 554 S.E.2d at 144 (death by electrocution raises "specter of excruciating pain" and the "certainty of cooked brains and blistered bodies"); *see also Bryan v. Moore*, 528 U.S. 1133 (2000) (dismissing as moot previously-granted cert petition raising whether Florida's use of the electric chair "unnecessarily exposes [condemned men] to physical suffering and degradation" and "wanton psychological and

botches. Pedro Medina's head burst into flames during his 1997 execution by electrocution—the second inmate to catch fire in the chair that decade—due to what a Florida court subsequently deemed "human error."[6]

Derick Lynn Peterson survived two applications of electricity during his 1991 execution in Virginia; it took three applications over seven-and-a-half minutes before he died. Wilbert Lee Evans bled profusely during his 1990 execution in Virginia; his blood sizzled as it dripped onto his shirt, drenching it, and he continued to moan until given a second shock of electricity.

Plaintiff believes South Carolina has executed at least one person by electrocution in a manner that caused needless and excruciating pain. See *Baxley v. Ozmint*, No. 3:07-cv-04067-CMC, Baxley Dep., ECF No. 47-8 at 140-41 (describing the electrocution of James Tucker, during which Colie Rushton, currently employed by SCDC as the head of Security and Emergency Operations, was "[l]aughing and joking" after "they took the hood off and the inmates face was black, had his mouth like that, and like I said, his eyes and everything was just like he was in just gruesome pain").

It appears that South Carolina has adopted its electrocution protocol primarily in response to human experimentation and botched executions—not scientific evidence. In

---

moral cruelty" violates the Eighth Amendment).

[6] This "human error" was identified as using too dry of a sponge, and on using the improper saline solution to conduct electricity. In Jessy Tafero's botched execution in 1990, in which he too caught fire, the report blamed the use of a synthetic sponge in place of a natural sponge. The engineers remained confident that the 74-year-old chair could not possibly have any flaws it its design. *See* Brent Kallestad, *Engineers say human error to blame in botched execution,* AP NEWS (April 11, 1997) (available at https://apnews.com/article/5b17fe6815673a23f1e88607c6e42e5a)

the first forty years of executions by electrocution in South Carolina, the State changed its protocol several times, often after a botched execution.

For example, when the State executed Jesse Jones in 1943, it used a protocol that involved an initial current of 2200 volts, which was so strong that Jones, who was a large and powerful man, "was raised several inches out of the chair."[7]   According to witnesses, blisters formed on his legs, smoke drifted from the headpiece, and "the faint odor of human flesh could be smelled." When the executioner applied the second current, the blisters on Jones's forehead grew larger and larger until they burst.[8]

The next year, when the State executed fifteen-year-old, ninety-pound George Stinney, Jr., they used a different protocol: 2400 volts, followed by a second burst of 1400 volts, and a third of 500 volts.[9] This method, too, resulted in unnecessary pain and suffering.  Although the first burst of electricity was so strong that it knocked the mask off of George's face, the electrocution was not immediately successful; while he was being transported to the funeral home for burial, George sighed loudly, and a witness briefly detected a heartbeat.[10]

Over the years, the State continued to change its electrocution protocol, varying

---

[7] *Jesse Jones is Executed for Murder*, THE GAFFNEY LEDGER (Apr. 6, 1943).

[8] *Id.*

[9] Deanna Pan & Jennifer Berry Hawes, *Young Lawyer Dusts of Old Evidence to Cast Doubt on George Stinney's Conviction*, Post & Courier (Mar. 26, 2018), https://www.postandcourier.com/news/special_reports/young-lawyer-dusts-off-old-evidence-to-cast-doubt-on-george-stinneys-conviction/article_d31c3a90-2928-11e8-b103-33404ec5d9c5.html.

[10] CHARLES KELLY, NEXT STOP ETERNITY at 54 (2016).

the strength and timing of the initial voltage and the subsequent charges, but that did not prevent botched electrocutions from happening. Plaintiff expects a significant percentage of executions by electrocution in South Carolina have resulted in unnecessary pain and suffering.

Plaintiff is not aware whether SCDC has ever developed an execution protocol for electrocution through any validated scientific or medical process that is designed to reduced pain and suffering.

Mr. Sigmon can also choose lethal injection, but Defendants will only tell him what drugs they might use, while reserving their "rights" to change their mind at any time. Accordingly, Mr. Sigmon cannot know: which drugs Defendants would actually use, and in what dosage and combination; the origin of those drugs, including where, when, and how they were manufactured or compounded; the quality control measures and results of any testing administered to ensure the identity, purity, potency, acidity or causticity ("pH"), and purity of the lethal injection drugs, and to detect contamination; how the drugs were stored and handled; and the expiration dates of both the drugs themselves.

As it stands, Mr. Sigmon will not know the protocol Defendants would actually use to execute him. Likewise, he will not know the training and qualifications of personnel administering it.  The risks posed by inexperienced and unqualified execution teams are well documented.  Without sufficient training, the team members might require multiple attempts to establish an intravenous line, causing unnecessary pain to the prisoner and even desecrating his body.  This risk is illustrated by Ohio's 2009 attempt to execute Romell Broom, whose inexperienced execution team and prison doctor stabbed him with needles for more than two-and-a-half hours, leaving him in agony, before the governor

halted his execution.[11]

Inexperienced and unqualified execution teams might also begin the execution without establishing a patent IV line in the prisoner's vein, causing the prisoner extreme pain and suffering and significantly delaying when the drugs take effect. These risks are illustrated by Florida's 2006 execution of Angel Diaz, when a misplaced line allowed the caustic lethal injection drugs to leak into the soft tissue of his arms, causing chemical burns so severe that the skin on his arms sloughed away but failing to render him unconscious.[12]

Similarly, the personnel for Oklahoma's 2014 execution of Clayton Lockett pierced a vein in his groin, causing him to write and gasp for thirty minutes before he died of a heart attack.[13] But even if an IV is properly placed, the rate at which the executioners administer the drug or drugs can affect both the pain the prisoner experiences and the efficacy of the execution.

A sordid episode in South Carolina's own history with executions suggests a combination of these risks. In 1997, Michael Eugene Elkins was probed with needles for

---

[11] *After Surviving Botched Execution, Romell Broom Dies of Covid-19*, EJI ((Jan. 4, 2021) (available at: https://eji.org/news/after-surviving-botched-execution-romell-broom-dies-of-covid-19/)

[12] Ben Crair, *Photos from a Botched Lethal Injection*, THE NEW REPUBLIC (May 29, 2014), available at: http: www.newrepublic.com/article/117898/lethalinjection-photos-angel-diazs-botched-execution-florida (Last visited: January 25, 2021). Counsel cautions the Court that the photos of the damage done to Mr. Diaz by the improperly injected drugs are quite graphic.

[13] Jeffrey E. Stern, The Cruel and Unusual Execution of Clayton Lockett (June 2015) (Available at: https://www.theatlantic.com/magazine/archive/2015/06/execution-clayton-lockett/392069/ )

more than an hour before the execution team located a supposedly suitable vein in the back of his neck, and only after Elkins himself asked the executioners, "Should I lean my head down a little bit?" The execution began at 12:01 a.m., but Elkins was not pronounced dead until nearly an hour later, at 12:58 a.m.

These risks remain a significant concern at SCDC.  South Carolina has used a three-drug lethal injection protocol featuring Pentobarbital only once, in May of 2011, and has carried out no executions of any kind since.  Upon information and belief, SCDC did not provide its employees with training even then. See *Baxley*, No. 3:07-cv-04067-CMC, Amended Complaint, ECF No. 6 at ¶ 25 (Dec. 21, 2007).  On at least one occasion, the employees administering the drugs developed their plan on how they would inject the drugs on the day of the execution as they were picking up the drugs.  Baxley, No. 3:07-cv-04067-CMC, Bracy Dep., ECF No. 47-4 at 60-62, 69, 74-75 & ECF No. 47-5 at 107:13-22 (June 8, 2009).

On another occasion, while the execution was taking place, drugs began to leak on the floor.  *Baxley*, No. 3:07-cv-04067-CMC, Baxley Dep., ECF No. 47-8 at 153.  The executioners hoped it would not be a problem and prepared to administer more drugs. Id. (describing Colie Ruston "act[ing] like it was all a game" while lethal injection "drugs along with [the condemned man's] blood and everything went on the floor" and the condemned man "flat-line[ed] without us going to the second set of drugs").  These guess-and-check procedures increase the likelihood of a condemned person suffering a painful and torturous death.

Sigmon's significant interest in his right to a constitutional execution weighs heavily in his favor in this action.

2.      The current procedure Defendants intend to apply to Sigmon's execution create a significant risk he will be deprived of his right to not suffer a needlessly painful and unconstitutional death.

The current procedure SCDC intends to follow involves no oversight, no information, and robs Sigmon of the right to make an informed choice on his method of execution. That faulty procedure creates the real risk that Sigmon will be executed in an unconstitutional manner. It offers no protection of the important rights at stake in this matter.

On the other hand, Sigmon's proposal dramatically decreases the chances of an unconstitutional execution. Each of the problems detailed above can be significantly reduced if Defendants' agree they will not execute Sigmon without providing him a detailed, accurate, and complete description of the specific protocols the State would use to execute Sigmon, whether by electrocution or lethal injection.

There is little burden on the Defendants to produce these protocols. The State presumably has some plan as to how it will carry out an execution. The Defendants can simply share this information with Plaintiff and his attorneys so they can make the informed decision both the Constitution and South Carolina law allow.

Because the Defendants' procedures offer no protection to Sigmon, and his proposed procedure involves both adequate constitutional protection and almost no burden on the Defendants, this factor also weighs heavily in Sigmon's favor.

3.      The State has no legitimate interest in continuing to insist it execute Sigmon in secrecy.

The Defendants' actions in this matter are unprecedented. Since 1985, when

-18-

executions resumed in South Carolina, the State has produced execution protocols for all of the condemned men who requested them. Throughout the United States, Plaintiff can find no person in the modern era of the death penalty executed with such little information provided about the method of execution.

In addition to abandoning their own prior practice, Defendants are not following any accepted practice related to execution methods. A foundation of procedural due process is the right to notice and the opportunity to be heard. *Dusenbery v. United States,* 534 U.S. 161, 167 (2002). The Defendants are denying both here.

Sigmon is receiving no information related to his method of execution. He has no notice of how the State will execute him. He cannot be heard on the matter because of the Defendants' refusal to give him any opportunity to challenge the procedure that will be used to execute him.

The Defendants' failure to provide information related to the method of execution reflects no legitimate interest by the State and this factor also favors Sigmon.

B.    The Defendants' actions violate Sigmon's Eighth Amendment protection against cruel and unusual punishment.

The 8th Amendment protects Sigmon from cruel and unusual punishment. That protection includes his method of execution if two prongs are present: (1) that the challenged method of executions poses a sure or very likely risk of serious illness and needless suffering and (2) that there exists an alternative method of execution that is feasible and readily implemented and that will significantly reduce the risk of serious pain. *Baze*, 553 U.S. at 50, 52.

The Defendants' secrecy surrounding the methods of execution Sigmon can

choose from blocks him from raising any challenge to the methods. The State cannot withhold information required to make an 8th Amendment challenge and at the same time claim Sigmon cannot make a successful 8th Amendment claim. The refusal to provide the information necessary to make the challenge is tantamount to violating Sigmon's 8th Amendment rights.

Because the Defendants are in sole possession of the information Sigmon needs to make a proper 8th Amendment challenge, the Court can stay the execution and allow Sigmon to obtain this information. There is no theory under which the State can withhold information required for a challenge and at the same time defeat the challenge or proceed to execution in the absence of the challenge.

C.    Defendants' actions are interfering with Sigmon's right to counsel.

The Criminal Justice Act (CJA) and its associated policies require a district court to appoint counsel for a financially eligible person seeking to vacate a death sentence. The Act encompasses the well-settled right to counsel up to the time of death, including representation by counsel and the opportunity to consult with experts regarding the manner of death. *Ake v. Oklahoma,* 470 U.S. 68 (1965).

To effectively advise Sigmon on the manner of execution, counsel needs the execution protocols. Otherwise, there is no information on which counsel can base advice to Sigmon. The Defendants' actions are actively preventing counsel from effectively representing their client and are violating his right to counsel.

## 2.    SIGMON WILL SUFFER IRREPARABLE HARM IF THIS RELIEF IS NOT GRANTED.

Irreparable harm cannot be remote or speculative; it must be actual and imminent.

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991). There is no question an unconstitutional execution causes irreparable harm. *Beaver v. Netherland,* 101 F.3d 977, 980 (4th Cir. 1996) (Hall, J., concurring in part and dissenting in part).

The problem is magnified here. As detailed in the complaint and this motion, there is no real dispute Defendants continue to refuse to provide information on execution protocols. In the face of multiple requests, they have continually denied they have any obligation to disclose this information.

The Defendants' unconstitutional acts will cause irreparable harm to the Plaintiff and this motion should be granted.

## 3.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST REQUIRE THIS COURT STAY SIGMON'S EXECUTION.

Because the State is the opposing party in this motion, the third and fourth factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). Both factors clearly favor Sigmon and the Court should grant this preliminary injunction.

When evaluating a preliminary injunction, the Court should consider the public consequences of a stay, balance the competing claims of injury, and consider the effect of relief on each party. *Winter*, 555 U.S. at 24. Each factor strongly favors Sigmon.

The District of Columbia District Court stated: "[t]he public interest is, of course, best served when government agencies act lawfully. But the inverse is also true: the public interest is harmed when the Government ham-handedly exercises its responsibilities." *Minney v. United States OPM,* 130 F.Supp.3d 225, 236 (D.D.C. 2015). There is no policy goal that supersedes the Due Process Clause. *Gordon v. Holder,* 721

F.3d 638, 653 (D.C. Cir. 2013).

Carrying out executions in a constitutional manner is vitally important to the public. The humanity recognized by the Supreme Court in *Baze* requires the State to make every effort to humanely execute Sigmon.

The only interest the State has in this instance is in carrying out the finality of its judgment. A stay to litigate this case has no effect on that interest. Additionally, it is the Defendants who have engaged in the behavior that makes this stay necessary.

The State suffers little to no harm if this stay is granted. Sigmon suffers irreparable and severe damage if it is denied. On balance, this factor clearly favors the granting of a preliminary injunction.

<u>**CONCLUSION**</u>

Every factor the Court should consider in granting a preliminary injunction weighs heavily in favor of a grant. This Court should grant the preliminary injunction and stay the execution of Plaintiff Brad Sigmon until this matter is litigated and resolved.

Respectfully Submitted,

***s/ Joshua Snow Kendrick***
Joshua Snow Kendrick (Fed ID 9037)
KENDRICK & LEONARD, P.C.
506 Pettigru Street (29601)
P.O. Box 6938
Greenville, SC 29606
Tel: (864) 760-4000
Josh@KendrickLeonard.com

Megan Barnes (Fed ID 13283)
JUSTICE 360
900 Elmwood Ave, Suite 200
Columbia, SC 29201
megan@justice360sc.org

Gerald "Bo" King
FEDERAL PUBLIC DEFENDER
Capital Habeas Unit
129 West Trade Street, Suite 300
Charlotte, NC 29202
Gerald_king@fd.org
*Admitted pro hac vice*

ATTORNEYS FOR PLAINTIFF

January 28, 2021